310-755 Anthony Smith v. Davis J.D. Steele Counsel, please It may please the Court, Counsel. My name is Alan Muller and I'm here representing the petitioner Anthony Smith. To briefly refresh your recollection as well as my own, this is a case involving an iron worker who was in the process of pulling rebar, a process that's described in the record as him holding it from one end. It's an inch and a half by a 40 or 50 foot piece of rebar. He whips it out, picks it up under his shoulder while somebody at the other end guides it into place where it needs to go in the footings of these windmills that you'll see around the countryside in Illinois these days. In the process of doing that, he describes that his co-worker dropped his end, leaving him with the brunt of this as they were trying to position it into place on his shoulder, injuring his, initially he presumed his shoulder, but when he gets him for treatment, it's the neck. The arbitrator concluded that the petitioner had failed to prove that he sustained anything more than a symptomatic exacerbation of his condition on that date. Now, when you read that, the last page of the arbitrator's decision, when I read it, I said, well, we win then. The arbitrator has found implicit in that statement that there was an exacerbation of a preexisting condition on that date. Therefore, we've proved our case. What she is implying in that, we don't have a separate decision by the commission. They simply affirm the arbitrator. So the arbitrator's decision, therefore, becomes a commission. So when I speak about what the arbitrator found and by reference is what the commission found. But she's implying in that that the petitioner has a burden to prove more than an exacerbation of a preexisting condition. And that's absolutely contrary to the well-established law in Illinois. And in my brief, and I won't go through it, you've read it, CISPRO said. It seems to be the theme of the morning. But isn't there an issue of credibility and determination here? I mean, isn't it a fair reading of the arbitrator and the commission's decisions that they found, for whatever reason, that the claimant lacked credibility? There was some inconsistent histories. Didn't at one time he tell one of the doctors he'd never been injured, but that obviously wasn't true. He never had any neck or back problems. I mean, didn't they sort of allude that they had a problem with his credibility here? Yeah, they did. I mean, there's no question about it. The problem is with their reading of that. There's no question. I take you through in my brief some of his testimony. There's no question he's a poor historian. He was confused in his answers to questions. I mean, Petitioner doesn't have, when he's being asked about dates on cross-examination by counsel, he doesn't have the medical records with the dates. He doesn't know what he told them. Did you tell him this on this day? Sure, if that's what it says. I don't know what I told him. Elsewhere in the record, there's a lot of evidence that Petitioner isn't the sharpest knife in the drawer. And I don't mean to speak ill of my client, but respondents witness said, you know, I had no problem with his job physically. It's just he wasn't very astute. Dr. McGregor talks about it in her deposition. Dr. Shea says, you know, he was a pretty straightforward guy. You know, if you look at the medical record, ignore the fact that, you know, you have this who's on first exchange about whether he went to the emergency room four times between the two dates that we know he went there. And there's no evidence that he did. There's just this extraneous mention in the emergency room records. Dr. Shea talks about it and says, you know, that's the problem with electronic charts. One erroneous entry gets perpetuated throughout the charts. And so that's why I keep a written record, you know, in my practice. Unfortunately, he's essentially retired, so we won't have the benefit of that going forward. But the point is, there's, you know, we subpoenaed records, respondents subpoenaed records. There's no evidence of that. But Petitioner's asked, well, did you go to the emergency room four times? Well, if that's what the records say, I guess I did. At the end of that exchange, he says, no, I guess I didn't. Is he lying? No, he's not. The trial judge wrote a detailed judgment order. Yes, he did. Where was he wrong? Where was he wrong? Well, first of all, I think he's reweighing the evidence, which is not his role. He's looking at the case, should be looking at it from a standpoint of, is the commission's decision against the manifest weight, is it contrary to the law? He goes through, as you say, a detailed analysis of it, but he's also jumping all over the Petitioner's credibility, doesn't recognize the fact, and makes a comment about the fact that he's on psychotropic medication. I'm not sure what relevance that has other than the fact that Dr. Shea said in his testimony that that could have an impact on Petitioner's affect. Could that explain why he's so confused at the time of arbitration about what symptoms he had after each of these, you know, the visit to the hospital in March, after his visit in May, before this incident at work? I think it could. Well, let me ask you this. I mean, you know, you have a point that's logical and intuitively has appeal, that the claimant is not some historian, and he may not be, you know, required to recall specific dates and times, and that's somewhat understandable. However, according to the Evans, when he first saw Dr. McGregor, he told... Doctor, I'm sorry, who? Dr. McGregor. Okay. That he had no complaints, had never been hurt. And Petitioner... If you set aside dates, why would he say that? Petitioner explained, and I'm not saying this makes logical sense to you or me, but in his mind he says, I work on the job, I have a lot of bumps and bruises, a lot of these jobs I work on as an iron worker, they have a no-accident policy. We've got to have 30 days without an accident, and then everybody gets prizes, et cetera. So I don't report everything. In his mind, he says, if I don't report an accident, it didn't happen. Now, he's talking to the doctor now. He's telling the doctor he's never been hurt. This isn't the employee. The doctor's not going to revoke his bonuses. But look at the memorial records when he's seen on June 5th, after this accident that we're here about, and he's denying any prior injuries, but he's describing one a month earlier. How does that make sense? He goes to see Dr. Shea, respondent's IME doctor, and he asks him, have you ever had any prior injuries? And he said, no, none that I've reported. You know, there's a disconnect here, and I don't think it's volitional. By that time, we know what their defense is. He knows what their defense is. I mean, if he's trying to fabricate something, he cleans up his history by that point. But, no, he goes in and tells the honest-to-God truth as he understands it. The point is, you know, yes, there are some gaps in his testimony, but look at the medical records and the circumstantial evidence. In March, he goes into the hospital at a parade. He says he thought he had symptoms radiating down the arm. Those records don't reflect that. In May, when he goes in after an incident in another employer, he has some neck pain, some scapular pain, nothing down the arm. He is working, finishes out this job in May, heavy-duty iron work, goes to this even heavier-duty work with the respondent in this case, is working at that. Respondent's own witness, their superintendent, says he was able to do the job. He had no problems with his job physically. He just didn't seem to get it. That was his testimony. Well, cutting to the chase, as you know, as an experienced attorney, the law is well settled. It's up to the commission to judge the credibility of the witnesses and the way to be afforded the testimony. Now, in light of the issue, and I appreciate your candor, acknowledging, yes, there are some variations and inconsistencies in his testimony vis-à-vis when some of these incidents happened, vis-à-vis whether or not he was even injured before, and, yes, you supplement that by saying, well, look, he has, these are explanations, he's not a perfect witness. But the bottom line then becomes the commission, tell us why the commission's assessment of his credibility and the evidence was clearly against the man of his weight. Where did they go wrong? In two respects. Number one, it completely ignores the testimony of Tishner's witness and respondent's witness that he was able to do this job without difficulty prior to this incident. After the incident, he was not able to do it. Number one. I mean, that's in the medical records. That's in the witness's testimony. Okay? So let's leave aside for a moment what Petitioner testified to. And you have both doctors saying if he was able to do that work before then and was unable to afterwards, when they were both given, Dr. Shea and Dr. McGregor, a hypothetical, which included these prior incidents, even though they didn't at the time of their visits with the Petitioner from his mouth have that history, they say, yes, that incident on June 2nd could or might have aggravated his preexisting condition, giving rise to the symptoms that he had. That's the evidence. Your position is, look, even if there's some inconsistencies in the evidence, your position is the chain of events supports the claim. There's that. Also, though, Your Honor, I think the arbitrator misapplied the law. In her statement, in her finding, she says he proved no more than a symptomatic exacerbation. Under CISPRO, that's all we have to prove. We don't have to prove this incident on June 2nd was the sole cause, the primary cause of his symptoms. But, you know, fact of the matter is the symptoms for which he's treating after that date are symptoms of cervical radiculopathy. He's got numbness and tingling in his fingers, which he did not have prior to June 2nd. There's no evidence in the record that he had those symptoms. Those are the ones that were the basis for both Dr. McGregor and Dr. Shea suggesting he not go back to iron work. Before that date, he was doing it, and nobody had any complaints about his problem. So the fact of the matter is, on that date, something happened that either caused or aggravated, as the doctor said, you know, his underlying condition. Well, it doesn't have to be one or the other. The arbitrator suggests the symptoms that he was having as a result of the workplace incident were simply consistent with preexisting conditions. And that's a misstatement of the medical evidence. If you look at both Dr. Shea and Dr. McGregor testified that persons with this preexisting problem as degenerative disc disease in the cervical spine, normally they're asymptomatic unless there's some incident or injury aggravating them. Both of them said that. And I can give you the page sites, but the fact is both of them, Dr. Shea, I think it's about 417, 418 in that vicinity. But anyway, he says cervical degenerative disc disease, most people with that are asymptomatic unless they have an injury or incident that aggravates it. And Dr. McGregor at 239 of the record says these degenerative changes are not always accompanied by symptoms. They're usually precipitated by some event. We have an event. There's no question that there's an event. We have an eyewitness to it, you know, who was there, heard him, didn't see him, but heard him exclaim, you know, ow, whatever, heard him grimace. I don't know how you hear a grimace, but, you know, fact is that witness and petitioner both reported it to respondent. Respondent doesn't question it. They say we don't have light duty unless there's a work injury. They provide them with light duty. I'm not clear from the arbitrator's decision whether she said there is an accident, but it's not causal connection. Or, you know, elsewhere it could be suggested in her decision that she says, well, there's no accident. This is just what he had symptoms, but they're consistent with this preexisting condition. Again, that's wrong, too. That's against the manifest weight. There's no evidence that these symptoms could have been just come on, you know, around that date. His history at the hospital, when he gets there, is consistent with what he testified to, that, you know, I was picking up this bar, I was lifting something at work, and I had these symptoms. And he differentiates the symptoms. Okay. Thank you. Counsel, please. Thank you, Your Honor. May it please the Court. Counsel, my name is John Cammon, counsel for Davis J.D. Steele. The commission's decision should be affirmed. It's not contrary to the manifest weight of the evidence. The explanation that the petitioner is not right is one explanation for all the problems of this testimony. Another explanation is that it lacks veracity. His testimony was originally he was carrying the steel on his shoulder. It later turned into I was ripping steel between my legs from below. One thing is for sure, one of his coworkers did testify he noticed he was having symptoms, and that's consistent with trying to do iron work with a bad neck. And his bad neck can be explained clearly by the event where he was carrying an I-beam and fell in May of 2007. He says that's not an injury because I didn't report it. So one explanation for his lack of reporting it, and one inference the commission could have drawn is he possibly could have tested positive for cocaine back then, and he would have lost his job, so he didn't say he got hurt. And eventually he just determined he couldn't do the iron work anymore, and so he had a new injury working Davis J.D. Steele. The arbitrator's decision saying that he had nothing more than a symptomatic exacerbation doesn't mean that there's a new standard of proof. The arbitrator also finds that the petitioner's histories are inconsistent. His testimony was confusing. He may have had some symptoms at work that day, but it's consistent with his preexisting condition of his cervical spine. The doctors confirmed on cross-examination that falling with an I-beam on your shoulder can also aggravate preexisting neck problems and cause radiculopathy, and in fact testified that a radiation of that pain over time down the arm is consistent with a progression of that aggravation or injury he had in May of 2007 as well. Dr. Shea says, I can't tell you what caused what because the guy didn't even tell me about the first injury or any of his other injuries. And when he first testified on direct examination, he testified about going to a St. Patrick's Day parade, going to the hospital for treatment for his neck and shoulder then, and said that I had pain going down my arm and it never went away. So these symptoms had been there for quite a long time. The arbitrator did not find him credible. There's plenty of reasons not to find him credible because he gave false histories. He went in time and again and told doctors I never had an injury. I don't know if he went to the ER four or five times. He said he went to Memorial. He said he did. Then he said he didn't. His testimony was all over the place. And frankly, the commission's decision to determine that he failed to sustain his burden to prove that he had an accident at work on June 2nd and that caused his condition to build in is clearly not contrary to the manifest way of the evidence. There's other credibility issues where he was working light duty, working with the doctors and said the employer doesn't have light duty. Can I have an off work slip? And the doctor at Mohawk says no. So he goes to Dr. Sheedy and gets an off work slip from that particular physician. So based upon all the evidence in this record, I would ask that the court affirm Judge Shore's order that he issued to the circuit court, finding that the petitioner failed to sustain his burden in this case. Barring any questions, Your Honor, thank you. Thank you, counsel. Ravot? Just briefly, Dr. Shea did say that he couldn't tell what caused this because the guy never told him about it. However, Dr. Shea had all that information from respondent when he saw him. He just chose not to address it. He did address it in his deposition. He was given a hypothetical, which assumed, you know, the March visit to the hospital, the May visit. You know, could this incident in June have aggravated a preexisting condition? Yes. The other thing I wanted to point out, you know, in terms of this May visit, or excuse me, this March visit to the emergency room after St. Patrick's Day parade. You know, you look at the records from that visit. There are three pages at page 502, 500 to 502 of the record. And he's complaining of left shoulder pain and specifically indicated in that record there's no neck pain. And yet he testified that he thought he had neck pain then. I mean, he has no reason. In fact, if he was trying to lie, he would have said, no, I didn't have neck pain then, even though he might have. He doesn't remember. So to say that this guy, I mean, there's a mention to him having tested positive six days after this event, cocaine. There's no evidence that he was, that that had anything to do with this accident. You know, so it's sheer speculation and, you know, wild speculation to suggest that he didn't report an injury in May because maybe he thought he had tested positive for cocaine then. The fact is, you know, the medical records, the witness testimony, and the doctor's testimony points to the fact that something happened to this guy that changed his condition, made him unable to do iron work on that date. I wish I had, all my clients were better historians and, you know, thought better, you know, I mean, remembered events, but they don't have all that information in front of them. So we would ask you to reverse the commission, send the matter back down to them for findings on the issues of TTD and medical. Thank you. Of course, we'll take the matter under advisement for disposition. We'll stand at recess for a short period.